## WALKER vs. BOLLING.

1. On principles of public policy, a master is liable to third persons for the misfeasance, negligence or omissions of duty of his servant, while acting within the scope of his employment; but the courts have refused, upon considerations peculiar to the relation of master and servant, to apply this rule to cases where one servant receives an injury from the negligence of another, while both are acting in the common business of the same master.

2. The master is bound to use ordinary care towards his servant, and not expose him to unnecessary risks; and this duty he does not discharge, when he associates with him in a service of peril those who are wanting in ordinary skill and prudence.

3. The owner of a steamboat is responsible for injuries to a slave employed as a deck hand on the boat, which are caused by the explosion of the boat through the habitual gross negligence of the first engineer, of which the captain had been informed.

4. The fact that the engineer was licensed is *prima facie* proof of his competency, but does not authorize the captain to retain him after he has been informed of his habitual gross negligence.

5. Where there is a general manager or superintendent, who is invested by the common employer with the duty and authority of employing and dismissing the inferior agents or servants who are under him, the master is responsible for acts of negligence on the part of the superintendent in failing to exercise due care and diligence in employing competent agents, or in not dismissing those who are proved to be incompetent. (*Per* Phelan, J.)

ERROR to the Circuit Court of Mobile.

Tried before the Hon. JOHN BRAGG.

TRESPASS ON THE CASE by Bolling against Walker, to recover damages from the defendant as the owner of the steamboat "Olive," for the value of one slave, named Isaac, alleged to have been killed, and of several others alleged to

Walker v. Bolling.

have been injured, by the explosion of the boilers of said boat; the explosion having occurred, it is alleged, through the negligence of the first engineer of the boat. The slaves had all been hired by their owner as deck hands on the boat.

The proof in the case showed, that Munch, the first engineer, was grossly careless and negligent of his duties, for some time previous to the explosion; that he was often found asleep during his watch, and that he oftentimes, when on duty, did not try the water in the boilers oftener than once an hour, although a proper degree of care on steamboats requires that this should be done every fifteen or thirty minutes; that sometimes he did not try the water for a whole watch, five or six hours; that this gross negligence continued for several trips; that the captain of the boat was told of this conduct, by the pilot, one or two trips before the explosion happened, and was also told of it by one of the watchmen.

The explosion was proved to have been caused by a deficiency of water in the boilers, while Munch was on duty. Munch was a regularly licensed engineer, and bore the reputation of being a good and competent one before he was employed on the "Olive." The "Olive," with her engine, machinery, &c., was new and in good condition, and had her full complement of officers and hands. The proof also showed, that usually the captains or masters of steamboats employed the pilots, engineers, &c.; and that the rate of hire for steamboat hands is greater than in service on land.

The counsel for the defendant requested the court to charge:

1. That, if the jury believed that the boat, boilers, engine, &c., were good and sufficient, and that she was sufficiently supplied with officers and men, and with a first engineer duly licensed, and of good character and reputation as such, and whom defendant supposed to be a competent and proper officer, then defendant would not be liable for the negligence of such engineer, as shown by the proof, if he had no notice or knowledge of such acts of negligence, although information thereof might have been given to the master, as shown.

2. That, if they believed plaintiff knew who was the first engineer on the boat, and that he had the same means of

knowledge as the defendant, at the time he hired the slaves on the boat, and that he had the same knowledge of the general character and standing of said Munch as defendant had, and that defendant had no notice of said special acts of negligence, then plaintiff could not recover.

3. That, if they believed that Munch was a duly licensed engineer, then defendant would not be liable for any negligence on the part of said Munch which was not known to him, although the captain might have been informed of it.

4. That defendant would not be liable for the value of a slave killed by the explosion, even if he would be liable for injuries not producing death.

5. That the defendant would not be liable for the negligence of the master in retaining said engineer after notice of his said acts of negligence, the master also being the servant of the defendant.

These several charges the court refused, and charged the jury as follows:

1. That it was, in general, true, that a master or owner would not be liable for damages occasioned to one servant by the negligence of another in the employ of the same master or owner; but that the rule further was, that the master or owner was bound to use reasonable diligence, in order that he might have competent and proper servants or agents to perform the respective duties in which they were employed; and that the acts of negligence on the part of the first engineer, as shown by the proof, (if believed by them,) having been made known to the captain of the boat, who was agent for the owner, would make the owner liable, although he himself was not specially informed of such acts of negligence.

2. That if plaintiff had any notice of the incompetency, unskilfulness or negligence of Munch, it would defeat his right to recover.

3. That the fact of the enginer's being licensed would not excuse the owner from liability on account of his negligence.

4. That plaintiff had a right to recover the value of the slave Isaac, if killed by negligence.

The charges given, and the refusals to charge as requested, are now assigned for error.

STEWART & EASTON, for plaintiff in error:

This cause involves a principle which, it is said, is now a well-established rule, both here and in England. The rule we here advert to is, " that the mere relation of master and servant, or · principal and agent, creates no contract, and therefore no duty on the part of the principal, that the servant or agent shall suffer no injury from the negligence of others employed by him in the same business or service ; and that in such cases the servant or agent takes upon himself the hazard of any such business or employment." Story on Agency, 4th ed. of 1851, by Sumner, p. 604 § 453, d. The reason given why the liability of the master shall not be extended to such cases of injury by a servant, is, " that neither principle, authority nor public policy, justified such an extension of the rule, and that the perils incident to such a service were as likely to be known to the agent as to the principal; and might be distinctly foreseen and provided against by him in his rate of compensation, if he chose, and he must be presumed in the absence of any different contract, to take them upon himself." Ib ; and see Farewell v. The Boston and Worcester Railroad Corporation, 4 ℩ etcalf Rep. 49. In such cases, the remedy, say the authorities, is against the wrong-doer himself.

The propriety of this rule is admitted. The rule itself is clear in its terms, and the reason on which it is founded is conceded to be sound and conclusive. But it is proposed to make a qualification, which shall impose an obligation or duty on the master or owner to see that persons only shall be employed who have sufficient skill and diligence to fill the different stations of the service in which they are respectively employed—and if any servant engaged in any part of the service become negligent, that he must be discharged, and if he be not, that the master becomes responsible for any accident in his department, although he knew nothing of the negligence, provided it was known to the captain or general superintendent; and this even towards fellow servants in the same employment. This qualification, we think, is entirely inconsistent with the rule; and we respectfully contend, that if the reasons given are sufficient to found the rule, they are equally sound to forbid this qualification of it.

20

Walker v. Bolling.

Practically, the point is one of the greatest importance; the precedent to be established by the court will be a case of leading authority, and the principle now proposed to be laid down, if maintained, must be carried out in a great variety of cases; it will form a new subject of litigation in innumerable forms; indeed, it will be difficult to find a stopping point; and the litigation which will arise under it will be of precisely that loose, uncertain character, most objectionable in courts, with our jury system, proverbially uncertain in result.

It will be perceived, at once, that this qualification violates the rule itself in terms, inasmuch as the captain is also a servant of the owner as well as the engineer, and is in the same employment. The owner is here made responsible for the negligence of the captain in not dismissing the engineer, and is thereby made responsible for his judgment. If the captain is guilty of wrong, he should be the party responsible, as well to the owner as to the party injured. According to the rule, however, the one who does the wrong is the only party liable. By the adoption of this qualification, the court places the servants employed in the same condition as strangers, towards whom there does exist an obligation, undertaking, or a duty, founded on a compensation, or a benefit received. Whereas, in this case, there is no such duty nor compensation. A carrier is responsible for freight as an insurer. He is also to a passenger; because he undertakes safely to carry, and is paid for it. The master is also responsible to a third person for injuries done to him by a servant in his employ, because he receives the profits of the business he engages in, and must calculate the risks, and pay the losses. But we must distinguish those cases from the one now before us, and if it be true that there is "no contract or duty," on the part of the employer as stated, but that the employed contemplates the risk when he engages, and stipulates his price accordingly, the reason fails, and the analogy does not hold.

The case must be placed on the same footing precisely, (so far as the claim for damages by the plaintiff here is concerned,) as if the servant employed were a free white man. There are special duties in respect to a slave, and towards his master, appertaining to that peculiar relation of hiring,

but there can be no distinction drawn as to the point we are now considering. We are to decide whether the slave-owner, who has by his contract exposed his slave to this danger, as he would have exposed himself to it, if he had himself taken the employment, is entitled justly to claim. The slave is his servant, and stands in his shoes. It is certain that the perils of useful employments must be encountered by some one—and while humanity requires that dangerous duties should not by any rule of law be imposed exclusively on slaves, still it would not be expected that any rule should be adopted which would throw all perilous labor exclusively on free men. If the rules of law then were different, and such as would create a liability for the loss of a slave, where they would not for a free laborer, slaves would never be employed in any task where there was peril, and from a false principle, the lives of free men only would be exposed. Their lives to their families, and to the public, are certainly of as much value, to say the least, as those of slaves. We take it for granted, then, that the rule must be the same as to both, and will treat it precisely as if a free man were suing for damages for an injury to his person.

The question, then, is as to the existence of any such duty, or guarantee on the part of the employer. We say there is none, and if this be conceded, the qualification is negatived at once, as well as the rule itself fully established. To decide that there is no duty, is to decide both propositions conclusively, the one as well as the other. It is well settled in this court, as well as in the English courts, that the contract of hiring implies no guarantee of the safety of the vessel, vehicle or implements to be used. Williams & Hitchcock v. Taylor, 4 Porter 234. Upon what reasoning, then, is it that a distinction is to be drawn between the soundness and safety of the vessel and engine, and the skill and care of an officer. The court goes on the ground that the deficiency in the vessel is visible, and presumed to be as well known to the employed as the employer, and he can as well judge of the risk, and encounter it or not, as he pleases; and that if he engages, he is presumed to have considered and weighed the risk in the profits of his employment. There is no more reason that the employer should guarantee the one than the

other; indeed, there is much less. By using a deficient vessel, engine or implement, which is visibly so, of course he saves the cost of a better one, knows the defect, and saves money by the use of the bad article. Not so where he employs a competent person, pays the full price for his services, saves nothing by it, and knows nothing of the negligence. The reason is much stronger against the owner in the case of a dangerous vessel, than in respect to a servant who proves careless.

It must be conceded that there is a class of cases, where the servant engaging, and knowing of a deficiency causing risk, could not be heard afterwards to complain of that deficiency. If a seaman is about to ship on a vessel, and is told he is to be placed under the command of a particular captain, and when he knows that on the skill and prudence of that captain his safety depends—could he be heard to say afterwards that he was not skilful, and claim damages, when perhaps this captain was better known to the seaman than to the owner? and when perchance the very inducement in the mind of the seaman was to go with that captain, who may be his friend? Could a seaman engaged for a voyage on a vessel with five hands, being expressly informed that the owner thought he could afford only to employ five, afterwards claim damages, on proof that it was not safe to go with less than ten hands? Such claim would be preposterous. Is not this, then, a case of that class? and must not the rule extend also to a case where the seaman has the same opportunity of knowing as the owner has? Does not the argument apply with double force, where the person employed receives higher pay because of the risks? and is it not conclusive when the engineer is an examined, approved and licensed officer, endorsed by the State, and when the State allows the owner to employ no other, but compels him to employ as engineer one of a limited number designated by law?

There are certain employments which involve occasional danger. Those who engage in them well know it, they expect to receive, and their services do command, a much greater price in such employments than in others free from such peril. It is shown that in this case, the wages paid were

much higher than in other service. Why is this additional price given? it is because it is not every one who is willing to work on a steamboat or other perilous undertaking; it is those who are willing to run this risk who obtain the benefit of this increased price. The owner, then, pays the employed in consideration of this risk, and he takes it upon himself. It would be the height of injustice to require the employer to pay for the risk, and then pay the damage besides in case of accident; it is manifestly against all reason. The owner is compelled to use engineers, pilots, &c., to prosecute this business; he risks his property, and his life if present, if not, the captain, who is said to be his representative, does; all know it, and all engage in it on the same footing; each can quit when he perceives danger, or when he is no longer willing to encounter it for the inducement offered. The rule is equally fair for all concerned, and each acts as a free agent.

It is true, we find it laid down, "that the master is bound to take reasonable care of his servant, and not to expose him to a service which is dangerous." This is the language in Story on Contracts. 3 ed. 1851, § 962. But what does this mean? It means that he must not, by any special command, require him to do that which is dangerous, and not contemplated by his contract; he must not expose him to danger; he must not send him to sea without provisions or water, nor without a compass. But the author does not leave us without the key to understand the true application of the proposition, for we find in the same paragraph these words: "He is not therefore responsible for an accident happening to the servant in the course of his service, unless he know the service to be dangerous, and the servant do not." The true meaning of the rule is therefore clearly shown, and it is manifest that it does not extend to those risks which the servant knows of, and is presumed to weigh for himself.

We will find a very great objection to the modification proposed, in practice, on account of its looseness and uncertainty. It is evident an owner or captain would never know, in any case, whether he was liable or not for an injury, till a jury should decide it as a question of opinion and fact. Different juries would decide differently on the same facts. Indeed, on matters of opinion of this kind, the question would be, who

would have most influence and have most friends on the jury. As it would be very much a matter of opinion, no case would probably occur where evidences of unskilfulness or neglect could not be shown or pretended; every case would require a suit, and the result no one could foretell; every case would be worth trying. This very case is strong proof of the uncertainty of opinion on these subjects. By the depositions a very strong case of negligence is pretended, and it was contended that the engineer should be dimissed at once. Yet, on a full investigation by the Board of Engineers of the conduct of this very engineer, Munch, he was declared to be worthy, and his license was restored to him. He now stands as a fit and proper person to be entrusted with such duties, endorsed as such by State authority; and parties by law would be compelled to employ him, to the exclusion of one whom the owner might think more fit, but who had no license.

The question becomes still more complex and uncertain by reason of another rule. It is settled at this term, that the owner is not responsible for an accident owing to the negligence of a pilot, if it be an occasional act of negligence. In the case alluded to, the slave was directed to go on a flatboat, the steamboat was put in motion so as to run down the flat, and the negro was drowned. It was the fault of the officer that he did not see the flat, and know that the way was not clear. This was an act of gross negligence, but the officer was reputed skilful and careful, and the owner of the boat was declared not to be liable for the value of the slave. We would ask how much negligence will be required to create liability? Is it one previous evidence of neglect, two, three, or how many? How great must be these evidences of neglect, to amount to a sufficiency to dismiss the engineer or pilot? And who is to judge when the measure of neglect is full? The captain has no interest to retain one, where his own life is at stake, and he gains nothing by saving in price; and yet, where his judgment dictates, that under all the circumstances, it is better to retain the engineer than to get another, and perhaps where he could not get one as good, the owner is made responsible because he is not discharged. We will again ask, how the case stands as to any

one who shall now employ this same engineer Munch? he has been by the competent authority restored to his license. Is it to be understood that if any one employs him, he must be liable for all his acts of negligence, because neglect has been heretofore proved? Can a hand who was on board with this engineer Munch, now go and employ himself under him, and receive higher wages founded on the risk, and' still, if another accident should happen, claim damages from the owner again, by proving that he was known by the owner to be negligent? and this, when he himself knew as much as the owner? Such would, however, be the clear effect of the modification of the rule proposed. Cases like these would give a bad opinion of the wisdom of law. But let the rule be the other way, then it is clear and easily understood by all; and the remedy would be alone against the one who does the wrong.

It would be exceedingly difficult sometimes to conform to the obligation proposed, to dismiss an engineer when negligence appears. Must the boat be stopped, no matter where she may be? How to procure another? An officer must necessarily judge of this from all the circumstances; as he has no interest different from the hands, it would seem to be as well to let him judge for all as well as for himself; and if any one differs, he is the free master of his own actions, and may quit the service if he thinks there is too much danger. But where, knowing all the facts, and when the owner does not, he still elects to receive the profits of his employment, it seems wrong to visit the result of an accident on another, who pays for good services, and knows nothing of the risk he is made to bear. In such a case, it has been well said, that the relation of master and servant does not exist, that the officers and hands are to be considered as being "in their own employment." 4 Metcalf 49. And, it is further said, in the same opinion, "that each is an observer of the conduct of the others, can give notice of any misconduct, incapacity, or neglect of duty, and leave the service if the common employer will not take such precautions and employ such agents as the safety of the whole party may require." This is his remedy; and we find it laid down accordingly in the books, that the "servant is not bound to risk his safety

in the service of his master, and may, if he think fit, decline any service in which he reasonably apprehends injury to himself." Story on Contracts, ed. of 1851, p. 1052 § 962; Priestly v. Fowler, 3 Mees. & Welsb. 6. One of the hands, it is said, left the boat for this cause, thereby making his election on his own judgment. He had that right, and it was no violation of his contract. It is therefore clear that the servant had the right to exercise his volition, and the consequence necessarily follows, that he would in justice be bound to exercise it.

The main rule we have contended for is, as we have said, well established; and it stands on a firm basis; no case, it is said, has been found where a recovery has been had under such circumstances. We are fully within that rule, and we respectfully suggest that there is no authority to warrant or support the qualification now proposed. We find no such qualification in any case-decided on that point. The occasional remarks in the argument of judges are to be taken and applied appropriately. We have seen that the authorities, in speaking of the duty of masters to provide for the safety of servants, do not mean to embrace the proposition now contended for; and in all the late arguments on this question, it is expressly said there is no implied obligation in the contract of hiring, and no duty arising in this case, as might be in the case of the hiring of an inanimate thing having no volition or power to elect; and the question is entirely placed on the capacity, intelligence and power of election of the employed to judge for himself, and stipulate or act according to his own judgment as to his safety. This ingredient in the transaction is entirely lost sight of, and disregards the principle heretofore adopted as to defects in the vessel. To apply the principle now proposed to be established to the various cases which must necessarily arise under it, would soon bring us to the very train of cases commented on in the case of Priestly v. Fowler, in which damages would soon be claimed; and which cases are stated, to show how impossible it would be to give countenance to such doctrine when attempted to be carried out. Angell on Carriers, ed. 1849, p. 551 § 578.

The evil has often been felt of extending too far this spe-

cies of liability, which would operate as a serious check, and prevent persons engaging in various useful enterprises. The courts have sought to restrain of late, instead of extending, the list of these constructive liabilities, and have been anxious to lay down rules to limit them. Thus it has been held, that where a butcher purchased a bullock, and employed a licensed drover to drive him home instead of doing it himself, and where the bullock did mischief while driving, the butcher was not responsible for the damage, but that the drover was. Story on Agency, § 454, a; Milligan v. Wedge, 12 Adolph. & Ell. 739. And the rule is now recognized, that where a servant is employed who follows a distinct calling and business, when he is employed in it, he is not to be considered a servant, but one liable for his own acts, as a subcontractor.

This brings us to the consideration of the cause under another rule of law bearing directly on the case. It is the law governing injuries by the negligence or fault of persons licensed, and whom the owner is compelled by law to employ. Where by law a vessel is compelled to employ a licensed pilot, inasmuch as the pilot is forced upon the owner, and he is not left to his free choice, the pilot is not deemed his servant; the rule making the master liable for the act of his servant does not hold, and the responsibility of the master is taken away. This is the settled law in such cases. Story on Agency § 456, a; and the numerous authorities there cited. The case here is precisely analogous. The law does not trust the owner with the right to judge of the competency and fitness of engineers, takes that duty upon itself, and does not suffer the owner either to navigate the vessel without an engineer, nor to employ the one he thinks he can trust, nor the one whom the captain shall by experience find best qualified, but compels him to take one of those presented to him as fit to be employed. In theory, this is the man nominated by the representatives of the party employed; and according to this theory as well as to all the rules and analogies of law, no responsibility attaches in such cases. Why or wherefore, (without resorting to the rule that the business of an engineer is of itself a special and particular branch of business,) the law should be different in respect to a licensed engineer from

the case of a licensed pilot, it is difficult to see, and would be incapable of demonstration.

The result, we think, of a correct view of the matter is, that there can be no such qualification of the rule, properly established, as is proposed to be made in this case; because the same reason fully applies against the qualification as does in support of the main, broad, clear rule, to wit: that in this particular view of the relation of the parties to each other, the relation of master and servant does not exist; that there is no obligation or guarantee, express nor implied, in the contract of hiring, that the person hired shall receive no injury from the defaults of fellow servants in the same employment, and therefore no duty arises in this respect; that each party contracts as a free agent, and it is implied that each knows the risks, and is understood to measure them in the price paid and received for the service; that neither is bound to rely, nor is willing to rely, on the judgmt of the other as to danger, but must judge for himself; and so long as one continues in the employ, he is considered as electing to receive the price and run the risk. Moreover, it would be impracticable to distinguish between the cases of an occasional act of negligence, repeated from time to time, and cases of continuing negligence, such as to amount to a sufficiency of negligence to fix a liability. Such a task would be too delicate and complex to practice; no rule could be defined to regulate the distinction, or be consistent, and none could know what their rights were.

According to the best opinions given on this subject, it is held, that it is the best policy that the law should be established as it is laid down in the general rule; that is, to declare that no guarantee exists towards one servant against the acts of another in the same employment. But when the case is applied to a slave hired by his master, the policy is greatly more manifest. If there be danger in the employment, the master by hiring his slave exposes him to it by his own will. If he is to be paid in case of loss, he will have no interest in inquiring how and to whom he is hired, nor under whose direction he is to serve; but if he is to risk the value, he will take care to inquire what kind of vessel he puts him in, who is to command the vessel, what kind of officers she

has, and as to the general safety of the person of his slave. The law should make it his interest to do this. It surely is the best policy.

In the case before the court, it was proved that the boat was sufficient and new; the engine and boilers also; that she was sufficiently provided with officers, crew and hands, and found in all things necessary for the business; that the engineer, Philip Munch, was on the boat previously to the time when Walker became the owner; that he had the reputation of a good and competent engineer; that he was recommended for the employment by the President of the Board of Engineers. It was proved that the price of hire of slaves was greater on steamboats than on land. It was proved that, after this transaction, Munch, the engineer, was dismissed by the Board of Engineers as chief engineer, and his license was revoked; but that afterwards he was reinstated by the board, and his license re-issued to him. All these facts appeared by the sheriff's own evidence, and defendant offered none. The negligence complained of occurred on the trip previous, and on the trip during which the accident happened, the captain was told of it, but the owner knew nothing of it. The boiler exploded, and it is assumed that it was the fault of the engineer, (although the causes of such explosions are yet a problem,) because there were evidences of negligence on his part. Under this proof, we contend that the charges given and the refusals to charge as requested, were erroneous.

JOHN A. CAMPBELL, contra:

1. The general principle is, that an employer is liable for the consequences arising from the mismanagement, negligence or inattention of his agents. The servants stand in the place of their masters, and their omissions and acts are visited upon the masters. 5 B. & C. 547, (12 E. C. L. R. 311;) 13 Peters 181; 1 Denio 91; 2 ib. 433; 12 Ad. & E. 737, (40 E. C. L. R. 677.)

The plaintiff in error finds a distinction between the case of a stranger suffering injury, and that of a servant employed to carry on the same business, who may have been the sufferer; it is said, that, in the latter case, there is no liabili-

ty on the part of the employer. We contend, that, conceding the rule to be as stated, it does not apply in this case. The exception to the general rule of liability is itself stated with an exception. There must be, on the part of the master or owner, a reasonable diligence to associate competent and skilful agents in the enterprise. The employer owes the obligation to his servant to associate with him no laborer who is not competent to the duties imposed. The law exacts responsibility, if he refuses to exercise reasonable diligence in the performance of his duties. 5 Wels. G. & H. 354; 1 Kelly's (Geo.) R. 195; 4 Porter 234; 35 E. C. L. R. 342; 9 Mces. & Wels. 710.

2. A person by whose mismanagement, negligence or unskilfulness slaves are killed, is liable to their owner. 2 Rich. 613; 3 Ired. 513; 11 ib. 16; 3 Hawks 246.

3. *Prima facie*, a licensed engineer is qualified for his profession. In this case, notice of his incompetency was brought home to his master. The general presumption is controlled by the specific information.

4. The master is the confidential agent of the owners, in all matters connected with the navigation of the ship. It was his duty to select the officers and crew, and he had the power to discharge them. The owner must, on the principles above stated, be held responsible for his negligence and misconduct.

GOLDTHWAITE, J.—A master is liable to third persons for the misfeasance, negligence or omissions of duty of his servant, acting within the scope of his employment. Story on Agency, § 416; Paley on Agency 224–5. And the rule is based upon principles of public policy, growing out of the general relations which the party who is held responsible occupies to the public, which require every one in the management of his own affairs, whether by himself or agent, so to conduct them as not to injure others. Farewell v. The Boston and Worcester Railroad, 4 Met. 49.

The courts have refused, upon considerations peculiar to the relation of master and servant, to apply this rule to one who receives an injury from the negligence of another, while both are acting in the common business of the same master.

Priestly v. Fowler, 3 M. & W. 592; Hutchinson v. The Railway Co. 5 W. H. & G. 341; Wigmore v. Jay, ib. 354; Murray v. S. C. Railroad Co., 1 McMullan 385; Farewell v. The Boston & Worcester Railroad, *supra;* Strange v. McCormick; Brown v. Maxwell, 6 Hill 592; Coon v. Utica Railroad, 6 Barb. 231; Hayes v. The Western Railroad, 3 Cush. 270.

As to the correctness of these decisions, whether the restriction imposed by them upon the application of the rule is too general and unqualified, or whether its limitation should not be confined to those, cases only, in which the character of the common business is such that it may fairly be implied that the servant intended to take the risk resulting from the negligence of those associated with him, it is unnecessary, in the present case, to inquire. It may be conceded, so far as this case is concerned, that the master is not under the same legal liability to his servant, under certain circumstances, as to third parties; but we do not understand from the decisions referred to, that the master is absolved from all obligation or duty towards the servant. He is bound to use ordinary care; he must not expose him to unnecessary risk; and indeed, the leading cases on which the counsel for the plaintiff in error relies to establish the position he contends for are, that the master is not bound to use more than ordinary care towards those who stand in the relation of servants to him. If he fails in the discharge of his duty in this respect, and the servant thereby sustains an injury, he is responsible; while, on the other hand, if he discharges this duty, the servant is presumed to take all the risks which enter into the service, including those which he would incur from the negligence of his fellow servants. Upon the principle of these decisions, it was ordinary care towards the servant, when the master associated with him in the common business, persons of ordinary skill and care. This is, in effect, the reasoning of Lord Abinger in Priestly v. Fowler, *supra,* and of Baron Alderson in Hutchinson v. The Railway Co., *supra.* But the master does not discharge this duty; or, in other words, does not use due care, when he exposes the servant to danger by associating with him, in a service of peril, those who are wanting in ordinary skill and prudence; and if the master chooses to do this, or his agent does it, the former will be

held accountable, and it is no excuse for him to say, "I delegated a duty arising from the relation I occupy, to a third person, who was in all respects competent to discharge it, and his neglect was one of the risks which the servant took." The answer would be, that the agent must be regarded as the master, and not as the servant, so far as this duty was concerned.

In the present case, the evidence shows gross negligence, and a criminal inattention to his duties, on the part of the engineer. It was the duty of the captain to protect the subordinate agents, employed in the common business, from the probable consequences of such neglect, by the prompt discharge of the person who, by his carelessness and recklessness, was endangering the lives of all on board; and this duty, as we have already said, devolved upon him, not as the servant, but as the master, as the representative of the owner. This duty he did not discharge; and for the injurious consequences of this neglect, the owner is responsible.

The fact that the engineer had been licensed was *prima facie* proof of his competency, but that would not have authorized the owner to have retained him in his employment after he was aware that, by so doing, he was exposing the lives of his other agents in the same business; and the same principle applies to the person representing him as owner.

The rulings of the court below being in accordance with the views we have expressed, there is no error in the record, and the judgment is affirmed.

PHELAN, J.—The opinion of the court, as delivered by my brother Goldthwaite, does not fully meet the views on which I prefer to rest the decision of this case. I therefore respectfully submit the following as my own views on the main question involved.

It is well settled law, that the master or principal is liable for injuries done to third persons, by acts of negligence or unskillfulness on the part of his servant or agent, in the course of his employment. 1 Ld. Raymond 264. This is a broad and simple rule, as respects those who are denominated strangers, or persons having no connection or privity with either the master or servant. Story on Agency, §§ 452, 456.

The chief question here is, whether the same rule applies in the case of different agents or servants in the employment of the same principal or master, where one servant by his negligence does an injury to his fellow servant? The extensive systems of agents and sub-agents connected with the business of modern society, make this a question of much delicacy and importance. The only adjudications we find on the subject are of comparatively recent date.

The first case in which the question arose is that of Priestly v. Fowler, 3 Mees. & Welsb. 592. Here two servants of the same master were employed in conveying goods of the master in a van, and by the negligence of one of them, in overloading the van, it broke down and injured the other, who brought an action against the master. It was held, that the action would not lie. Lord Abinger, who decided the case, makes an argument against allowing such an action, based upon public policy. His argument is, perhaps, a little too refined. The general burthen of it, however, is, that public policy requires that, in such a case, a servant, as to the acts of his fellow servants, must look out for his own safety. He makes, besides, this observation : " He (the master) is no doubt bound to provide for the safety of his servant in the course of his employment, to the best of his judgment, information and belief."

About the same time that the case of Priestly v. Fowler was decided in England, the case of Murray v. South Carolina Railroad Co., 1 McMullan 385, was decided in this country. In this latter case, in consequence of the negligence of the engineer in not checking the speed of the locomotive in time, when there was a horse upon the track, of which he was admonished, the cars were thrown off the track, and the plaintiff, who was a fireman, had his leg broken, for which he brought an action against the company. It was held, that the action would not lie.

The case of Farwell v. The Boston and Worcester Railroad Co., 4 Metcalf 49, comes next under review in this connection. In this case, two persons were employed by the Railroad Company, one as engineer to the locomotive, and the other to tend the management and shifting of the switches on the road. The latter negligently left or put one of the

switches in such a position that the cars were thrown off the track, whereby the engineer was injured, who brought his action against the Company. It was held, that the action would not lie. C. J. Shaw puts the decision mainly upon the ground, that "he who engages in the employment of another for the performance of specified duties and services, for compensation, takes upon himself the natural and ordinary risks and perils incident to the performance of such services; and in legal presumption the compensation is adjusted accordingly." "And we are not aware," he remarks, "of any principle which should exempt the perils arising from the carelessness and negligence of those who are in the same employment. These are perils which the servant is as likely to know, and against which he can as effectually guard as the master. To say that the mas· ter shall be resposible, because the damage is caused by his agents, is assuming the very point which remains to be proved."

The two next cases we find are English cases, which were considered together, and are reported in the Law Reporter for December, 1850, p. 379, Wigmore v. Jay, and Hutchinson v. The York Railroad Co. In the former case, the plaintiff's intestate, who was a common laborer, was killed by the falling of a scaffold. The head carpenter, at the time the scaffold was erected, allowed a pole which was unsound to be used, even after its unsoundness had been pointed out to him, and in consequence of its unsoundness the scaffold fell and killed the plaintiff's intestate. This action was brought against the common employer by his widow and administratrix, under Lord Campbell's Act, which gave an action for the benefit of the family of any one who had been killed by negligence, against those guilty of the negligence. It was held, that the action would not lie. In the latter case, which was also a case under Lord Campbell's Act, the plaintiff's intestate, whilst engaged in the service of the Company, was killed by a collision of the Railroad trains, produced through the negligence of other servants of the Company. The court held, that the Company was not liable.

The English court in these cases put their decision upon the same ground as that taken by C. J. Shaw in the case in 4 Metcalf, although they do not seem to have been aware of

that decision. They say: "The principle is, that a servant, when he engages to serve a master, undertakes, as between himself and his master, to run all the ordinary risks of the service, and this includes the risk of negligence on the part of a fellow servant, whenever he is acting in discharge of his duty as servant of him who is the common master of both." Mr. Baron Alderson, however, adds this observation: "Though we have seen that a master is not, in general, responsible to one servant for an injury occasioned to him by the negligence of another servant, while they are acting in one common service, yet, this must be taken with the qualification, that the master shall have taken due care not to expose his servant to unreasonable risks. The servant, when he agreed to run the risks of the service, including those arising from the negligence of his fellow servants, has a right to understand, that the master has taken reasonable care to protect him from such risks, by associating him with persons of ordinary skill and care."

The same general doctrine was held in a subsequent case in Pennsylvania. Strange v. McCormick, Law Reporter for April, 1851, p. 619. It has been also referred to and approved in a case in New York. Brown v. Maxwell, 6 Hill 592. See also Coon v. Utica and S. Railroad Co., 6 Barbour 231.

We gather from these cases certain general principles which may be thus stated:

Where several servants, or classes of servants, are employed about a common service, it is the duty of the common employer to exercise reasonable care for the safety and protection of all, by providing persons of ordinary skill and ability for each particular part of the service.

Further; that for all injuries which may result to one servant from the negligence of a fellow servant, acting as servant, the common employer, as a general rule, is not responsible, because the servant stipulates, impliedly, to run the ordinary risks of the service, among which are to be considered such acts of negligence on the part of his fellow servant; hence, such acts, in respect to him, are not the acts of the master through his agent, but the acts of the wrong-doer simply, to whom alone he can look for redress.

But an important inquiry meets us here, not embraced by these principles, and which we do not find to be covered by any of the adjudicated cases. It is this: When there is a general manager or superintendent of the service, with inferior agents or servants, or classes of agents or servants under him, and such general manager or superintendent is invested by the common employer with the duty and authority of employing and dismissing those who are under him, are acts of negligence on the part of such general manager to be considered as falling within the ordinary risks of the service, for which the common employer is not responsible? And again; even if other acts of negligence will be so regarded, are we so likewise to regard his acts of negligence in not exercising reasonable care and diligence in not employing competent inferior officers and servants, or in not dismissing such as prove incompetent?

In regard to all other acts of negligence on the part of the general manager or superintendent, I decline to express an opinion until the case arises. But with respect to the last mentioned kind of negligence, namely: that of failing to exercise reasonable care in procuring competent inferior officers and agents, where that falls within the scope of his duty, or in dismissing such as prove to be incompetent, I must hold, that they cannot be included among the risks for which the master or common employer shall not be held responsible.

To hold otherwise, would be, as I maintain, to destroy the valuable general principle recognized and established in the very cases which have been quoted, in which it is held to be the duty of every master or principal to provide men of ordinary care and skill for each particular station, for the safety and protection, not only of strangers, but of those engaged in his service. This duty of the master is expressly retained in the very cases where he is held not to be subject further than this for injuries which may result to one servant from the acts of negligence of his fellow servant. Whether the master will do this or not, is no part of the ordinary risks of the service; he is strictly held to the performance of it at all times. See Wigmore v. Jay, and Priestly v. Fowler, *supra*.

It follows, also, that the law will not allow any shift by which that may be done indirectly which cannot be done di-.

rectly; in other words, the law will not allow a master, whose duty it is to employ none but men of ordinary care and skill, in all branches of the service, to devolve the duty of making such employment on his general manager, who may be irresponsible, and by such means become irresponsible himself, for a neglect of this important duty.  As to that much, the general manager must, upon principle, be held to be the agent of the master, not only to the world at large, but to his inferior officers and servants; and his neglects in this regard will be the neglects of the common employer even as to them.  If he employs or retains incompetent subordinates, the master will be responsible for such an act of negligence on the part of his general manager, even to a person engaged in the same service with the general manager.

Having settled the principles by which I proceed, I find but little difficulty in coming to a decision in this case satisfactory to my own mind.

The death of the slave, Isaac, and the injury done to the other slaves of Bolling, who were hired on the boat, resulted from the negligence of the engineer, by which the boilers were exploded.  The testimony shows a case of habitual and gross negligence on the part of the engineer.  The captain of the boat had been notified of the misconduct of the engineer, for some time previous to the disaster, and did not dismiss him, as he had power to do, and as it was his duty to do.  For this act of negligence on the part of the captain, according to the principles before laid down, the owner is responsible.  For that duty he was the agent of the owner, as well to his subordinate officers and agents, as to the world at large; and notice to him, under such circumstances, was notice to the owner, of the incompetency of the engineer.  It was not a casual or accidental act of negligence that produced the injury, but an act of habitual neglect, for which neglect he ought long before to have been dismissed.

These are the reasons for which I concur in affirming the judgment below on the principal question involved.